The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention. The court is now sitting. God save the United States and this honorable court. Thank you very much. Please be seated. Good morning to everybody. We are ready for argument this morning. The first case is Exclaim Marketing v. DIRECTV. Mr. Nanny, glad to hear from you. May it please the court. Thank you, your honors. Good morning. When the jury came back with its verdict in this case, we won. We received a jury verdict that confirmed that my client was wrong and it was entitled to damages as a result of that. It was only 10 months later that the trial court said, not only did you not win, you lost and you lost badly. That happens sometimes, doesn't it? Yes, sir. It does. And we're here because... You just think it happened erroneously this time. That's exactly why we're here, your honor. That was my next line. We believe that the trial court erred in a couple of different ways. And let's start with the damage award that the jury gave to Exclaim Marketing that the trial court took away. The trial court in its ruling on the Rule 50 motion said the acts of DIRECTV were not inter-affecting tolerance. We think it's clear that they were. That if you look at the North Carolina Supreme Court case of White v. Thompson, what they say is that the act applies to market participants. Well, plainly, we were a market participant. Both DIRECTV and my client, Exclaim, were in the business of offering satellite television service to consumers. Now, we did it indirectly because we did it through the independent dealers. But the fact is, we were a market participant. But you weren't participants together. Well, it's interesting, your honor. We were in the sense that if you go to Washington today and go outside the Redskins Stadium, there are people selling Redskins hats, people selling Redskins t-shirts. They are market participants along with the Washington Redskins because if the Washington Redskins didn't exist, they wouldn't be there and there would be no market for their products. Now, taking one step back though, even if you disagree, if you say that, Mr. Nanny, your vision of Chapter 75 is too broad, even though I think White v. Thompson makes it clear that being a market participant is enough. The jurisprudence of this court clearly says, you want more than that. And there have been instances where this court has said, because you weren't competitors, because you weren't, as you said, market participants together, then you fall outside of the statute. But my client sold to DISH dealers. That's a competitor. They clearly were competitors to the extent that Exclaim Marketing was offering services to DISH dealers and DirectTB interfered with that relationship. So I think under any circumstances, Your Honors, Chapter 75, 75-1.1 talks about business activities being all business activities, regardless of how denominated. Chapter 75, Section 75-16 says... North Carolina courts have stepped that language back and made it much more restrictive in a what it might mean to the man on the street just reading it. There's no question. There have been exceptions that have been imposed by the judiciary. But again, I'll contend to you that White v. Thompson says, if you're a market participant and you're injured, you have a claimant of the statute. I could not find a published case where this court has ever even considered what the teaching of White v. Thompson is. And I think that that's dispositive. It's not dicta. They give you an analytical framework. They say there are two classes of plaintiffs that are covered by the statute, consumers and market participants. And I'll contend to you that because we fall in that second category, we're entitled to rely on the statute. I want to talk about the unfairness. In fact, as the court said, what DirectTB didn't or did do was not unfair under the statute. I think it's important. This court has said you have to look at the acts based upon human experience. You have to look at the circumstances. Somebody walks out on Main Street today, he pulls out a gun and shoots somebody. Is that unethical? Is it immoral? Is it improper? Well, it depends. If he did it because he was going to rob the guy, it absolutely is. There's no question. If the guy with the gun did it because the guy across the street was trying to kidnap a two-year-old and he stopped the kidnapping, well, that's different. The trial court in this case abdicated its responsibility to look at the whole picture, to look at the context in which the conduct occurred. This court has said in the South Atlantic Limited Partnership, Tennessee, that the decision of whether or not something is unfair is both a legal decision but also a highly factually specific decision. And I think what the court did here was it looked at the one issue that the jury decided. The jury decided- That issue was they made 100 and something calls over some number of years. Yes. Yes. And she said, well, looking at that alone, that doesn't get me there. Well, again, go back to my analogy. If somebody's out on the street, if you just hear that there was a gunshot, you don't know if that's good or bad. You've got to understand what was going on in order- What do you think's added to that to make it bad or evil or unclear? I'm glad you asked, Your Honor. I thought you'd get there. DirecTV engaged in conduct for a period of five years. The jury heard testimony. Now, Kristen Haley was at DirecTV. I know, but what did they do that you think is evil? I'm coming to that, Your Honor. The jury heard testimony that Kristen Haley, an employee of DirecTV, said to other people at DirecTV that, with regard to my client, with her, it's personal. So what? So what? Your Honor, they called- That's the evil that somebody's taking on that, and that's the evil that she takes at work personally? No, it's a circumstance. And what I'm going to tell you is I'm going to give you about five other circumstances. Well, I'm waiting to hear them. Okay. Their claim is that what they did was proper because they were trying to police their trademark? I know. You're saying what they did, what's the evil? Trying to protect the trademark? Well, the evil is they interfered with our business relationships. They caused us to lose clients. They caused our business to go away because they interfered with our ability to service our clients. And you were conducting yourself entirely properly? I think so, yes, sir. And understand, Your Honor- Even though had you been in the same situation, it's testimony that your company would have done the same thing. There was one line, but there is that testimony, Your Honor. I can't deny that Mr. Zyk said exactly that. But understand- Explain that. One line, I mean, that line is pretty important. Well, I think that Mr. Williams did a nice job of leading you up to that point. I think that Mr. Zydonik is not in the business of what we were talking about here in terms of taking care of the trademark. Mr. Zydonik is the salesperson. Let me say this. This is what I hear you saying. You wish he hadn't said that. There's no question. I'm not going to deny that, Your Honor. I hear all that. He's not in that capacity. He doesn't know. Which translates into, gosh, we wish he hadn't said that. It does. But I want to go back to these circumstances because this is important, all right? But their defense is we can do all these 175 telephone calls. We can disrupt your business. We can bother your clients and your relationship with your clients because we're doing that in good faith. No, they weren't. In 2008, my client became aware that DirecTV was unhappy with the fact that we were in business. And you'd ask the question, was what we did entirely above board? It absolutely was. The independent dealers... That's not what the jury said. I'm sorry? They said, do you find... Let me see if I can find the exact wording. Well, they found trademark infringement. I don't... Do you find by preponderance of the evidence that your client used their remark in a manner which had a tendency to mislead, create likelihood of deception, make a misleading misrepresentation in an advertisement? That doesn't sound like clients are good faith to me. And I believe the jury got that wrong, but I also understand I'm not in a position to argue about that. Let me tell you, your answer is, I wish the jury had done that. That's true, John. But if you go on to issue 11, the issue is, did it divert sales from DirecTV? No. And understand that what my client was... What difference does that make, though, under the infringement statute, which is what the claim of DirecTV is? Well, that only goes to their damages, as to whether or not the damages that were awarded to them. Yeah, and let me finish up on this in fairness, because I do think it's important, Your Honor. 2008, 2010... Well, do you think you can separate, though, the trade... I mean, if you're going to use the totality of the circumstances and all the events, doesn't the trademark infringement have to be part of that consideration, even under the North Carolina Act? Sure. But how does that fit into the analysis? I mean, good faith on their part is not a defense. Bad intent is not an element of the claim under Chapter 75. The fact that the jury found trademark infringement, they awarded them damages. I mean, that's where that comes in. In terms of whether or not they violated Chapter 75, I don't think pointing to the fact that we used the trademark or that we had the trademark. But we have the two bases that the trial court used, one being in and of it affecting commerce, which the trial court essentially looked at, I think, our food line case is instructive on that in terms of business to business, and the focal point is being affecting consumers. It just doesn't seem as though there's anything going against the trial court's determination. This really was not about consumers, even though you gave me one example there. It's really about business to business. And if we deal with the in and of effect of commerce, don't even get into this unfairness. Absolutely. What I'll contend to you is that it's interesting that the food line case, and there was a lot of weight placed on that. If you look at it, it's a very long opinion, and the entire conversation about Chapter 75 is about five paragraphs. That's it. Whether it's right or wrong, White v. Thompson, which is the most recent statement by the North Carolina Supreme Court, doesn't talk about consumers, doesn't talk about the need for consumer injury. The food line is on point, though. It deals with reporters going in and doing basically the same kind of thing. If the court didn't held it in and of effect of commerce, then the North Carolina Supreme Court case is not the opposite of that. But the North Carolina Supreme Court has not required a consumer injury. And I think that's where I disagree on it. This doesn't help you, but this is the sort of question dealing with the interpretation of the Unfair Trade and Deceptive Practices Act. If North Carolina wasn't the only state in the Fourth Circuit that wouldn't let us certify a question of state law, this is kind of an ideal candidate. But it doesn't, so we're going to have to do the heavy lifting here. And I understand that. With regard to the unfairness, my client reached out to DirecTV 2008, 2010, 2011, repeatedly, and the cites are in the brief. We continually said, if you've got an issue with what we're doing, if you think we're violating your trademark, tell us. Work with us. Help us to understand what we need to do in order to correct that. So when you go back to the clean hands argument, you weren't a licensed dealer, you weren't in any contractual relationship with them. What obligations did they have to do anything with you? They didn't have an obligation. But again, when you look at the interference they did to our business, that interference was done with the intent to harm us. And the proof of that is, all they had to do was pick up the telephone and call us. Well, you know, when you put it in the posture that, well, if you do anything, just call us and we'll be fine. And then they take action, but the deal isn't going to appeal. You then sue them. The jury, as Judge Agers pointed out, comes out and say, well, maybe you didn't just say it's all right and it's fine if we'll work with you. Maybe you were continually infringing on that trademark. That's a jury finding we've got here under the Lanham Act. It's squarely before us. Well, but you've also got a jury finding that we were entitled to $760,000 as a result of their conduct. Well, let's see, North Carolina law is kind of strange the way they do that unfair and court law as to whether it is a unfair and acceptable trade practice. Yes, it is. And what I'm saying to you, though, is that in order to make that determination as a legal determination, as this court said in South Atlantic Limited Partnership, you've got to look, human experience, you've got to look at the circumstances. And I understand what you're saying is you think there are circumstances that don't help my case. But what I'm saying is I think the circumstances taken as a totality shows that what DirecTV did. Would you spend a few seconds on the calculation of damages under the Lanham Act, if we were to say that was okay, the calculation of the $610,000? Yes. They argued post-trial that they found 159 individual telephone numbers that we owned that infringed. The trial court accepted that as a fact in her Rule 50 ruling. What she relied upon were defendants exhibits 225 and 233. 225 and 233 are lists of telephone numbers. 225 talks about, on the list it says National Call Center. And I'll admit to you that my client has at times used the term National Call Center, but it is absolutely not the only company that does that. The jury heard a recording of another company referring to itself as a National Call Center at trial. There's nothing that ties those 159 numbers in 225 and 233 to my client. There was no testimony at trial that would have established that connection. The only person who testified about it was Chris Jones, who was the owner of KDA, the agency. And all he said was, yeah, that's a document, it looks like a document my company would have produced. And the other question I have has to do with maternity fees and why did the jury respond? Why not in extraordinary circumstances? I don't think there's anything extraordinary about this. What's remarkable is that the way the Lanham Act is written, you can find trademark infringement. But in fact, what happened was every time my client sent a call to an independent dealer and it sold DirecTV, DirecTV made money. This is not a typical infringement case. In a typical infringement case, I bring in some blue jeans from China and I put Gucci on the rear end and I sell it. Well, I'm taking sales away from Gucci at that point. There's not one shred of evidence in this case, Your Honor, that anything my client did harmed DirecTV financially, economically, any other way. They brought in their head of marketing to say, we're concerned about our brand and people using our brand without our permission. That goes to damages under the federal statute. Profits and damages are considered in the conjunctive. They're not mutually exclusive. Yes, sir. And the court's discretion to increase those damages, the statute says it has to be compensation and not a penalty. And my question would be, what are we compensating for? What is the court compensating for when they weren't harmed? Now, Mr. Williams is going to tell you, oh, our use of the mark did harm them. There's not one shred of evidence in this record that ties anything we did to any harm to DirecTV. I ask Ms. Haley specifically, did anyone ever tell you, did any consumer ever tell you they had a problem with this claim? No. Did any dealer ever tell you they had a problem with this claim? No. Doesn't the question of exceptional in this case, doesn't that go to the intent to infringe the trademark? It doesn't go to any, it's not intent in the volitional sense, like they intended to, rather than it just was a circumstance or happenstance. But under Georgia Pacific, doesn't the question here of attorney's fees, doesn't willfulness go to the intent to infringe? And the jury found that you acted with intent to confuse. Isn't that the same thing as willfulness? Not in my mind. But I understand what you're saying, Your Honor. I also understand what the Georgia Pacific case says about that. But the fact is, exceptional means something beyond the ordinary. Not necessarily so. I think after Georgia Pacific, it's fairly clear that it means intent to infringe. That is what is exceptional, I think. But you have a chance to respond to that. And just briefly, in answer to that, Your Honor, is the decision not to award the attorney's fees was within the court's discretion, the trial court's discretion? Well, by the way, everything else wasn't within our discretion, and now that was, you say? Well, I disagree. Well, no, I mean, clearly the Lanham Act and the attorney's fees were, but the unfair and deceptive trade prices were not. Thank you, Your Honor. Thank you. You have a chance to get back up to. Thank you very much. Mr. Wade? Can I hear from you? Good morning, Your Honors. I'd like to focus on three issues. The first is that the trial court properly found that the conduct at issue was not unfair or deceptive under the Trade Practices Act. Second, the trial court did not use its discretion in increasing the award of profits based on the evidence in the record. And third, that the trial court applied the wrong legal standard with regard to what is an exceptional case in post-Octane and this Court's Georgia-Pacific decision. Now, with regard to the first issue, I agree completely with Mr. Manning. You need to look at all of the circumstances to be egregious and aggravating circumstances. Why are the circumstances here, then, subject to and meet that criteria? Just make your argument on that. What Exim is asking the Court to find as a matter of law that less than two and a half phone calls a month to a call center that receives tens of thousands of calls for the purpose of investigating valid trademark infringement claims, that the jury found was legitimate and done with willful intent, that that is an unfair and deceptive trade practice under the law. And that is simply absurd. The idea that a company investigating its own trademarks and the use... You wouldn't let a judge even submit it to the jury in the first instance if you think it's absurd. Your Honor, this was an issue that we because we didn't dispute that the phone calls were made, but under the law and the proper standard, as Your Honor indicated during Mr. Manning, is the jury finds for the facts and then it's up to the Court to decide, do those facts warrant a finding as a matter of law of unfair or deceptive trade practices? That's exactly what happened here. The jury found that the phone calls were made and the trial court found... Why didn't you stipulate the facts and ask the jury to make a ruling on it as a matter of law and take it away from the jury? Well, the ruling as a matter of law would still have to be made by the district court. That's what I'm saying. Stipulate to the cause the number of calls. It just has to ask the judge then to make the determination on those facts. Did they dispute the number of phone calls? No, Your Honor. Okay. So we don't think that the... Why we didn't stipulate it? We, and I know it's not before... That's a foul strategy. What was that? The question started with why didn't it go to the jury in your view? You said the jury had to make a determination on facts that they may not have to make it if you agreed. Your Honor, and I don't believe this is in the record, but there were arguments that we made prior to the case going to trial. Well, I don't think you can make it if it's not... Okay. But it was something we did not think that that could be deemed an unfair deceptive trade practice act as a matter of law. And the trial court said, we're going to put it on the question. Did you ever argue to the court that you should win on that matter, judgment as a matter of law on that issue before it went to the jury? Yes. Okay. Yes. And that was in our post-trial motions and preserved at the time. Yes. Preserved at the time. So in other words, you made that argument. The district court sometimes may think you're going to win it, but they still like to let the jury decide. Correct. Since I guess you did have some issues that had to go to the jury anyway. Well, and also it had... Is that correct? Yes. Because the jury had to decide. I mean, keep in mind the focus of Exclaim's argument, their entire case was based on the notion that DirecTV made either false or improper statements to third parties that caused them to lose business. That was their case. That was what their damages experts said was the cause. And the jury found for DirecTV on all of those, it found that the statements that were made were either not false or they were made with a legitimate business purpose in mind. And so the jury still had to decide, did DirecTV violate or engage in any of that? What was it to Exclaim's counter theory on how you were supposed to find out if they were violating your trademark? If you can't call, what are you supposed to do? Your Honor, that... Call a private eye? And we did that too. And the problem is, I mean, this notion, and Exclaim made this argument before that DirecTV was somehow called generic phone numbers. It's nonsensical. DirecTV was going through books. I mean, if you look at page 14 of DirecTV's brief, which is a screenshot, where they're going through phone books, looking for misspellings and calling the number to find out who's behind it. There's nothing else you could do. As Exclaim's principal, Mr. Stepanek testified, you would have no way of knowing that the phone number belonged to Exclaim just by looking at the listing. So under all the circumstances, there is nothing unfair or deceptive about DirecTV investigating. And as Your Honor pointed out, their witness said they would do the same thing. Of course, any business would do the same thing. If they see their name in a phone book next to a number that they don't recognize, you're going to call the number. It's not exactly a high-tech investigation. No, Your Honor. It's not. Although the problem was Exclaim's conduct made it more difficult because the phone calls would come in, they would identify themselves either as National Call Center or not identifying themselves at all. So it was difficult to figure out who was actually placing the listings. On that end of the affected commerce problem, the reason for the trial court to set aside, FoodLine appears to be pretty close or analogous to this case. The opponent says that the white case in North Carolina does not emphasize the consumer aspect of it. Do you agree? No, Your Honor. I don't. I agree with you that FoodLine is the closest case you're going to find and the entire purpose of the act is to protect consumers. Now, of course, there are situations where one company may have a claim against another company because the conduct at issue is going to ultimately affect consumers. But in the white case, the court actually found that the statute didn't apply. It found that these were just between partners involved in a business enterprise and the statute didn't even apply. But the entire purpose is behind protecting consumers. And with FoodLine, it was the same thing. DirecTV's conduct here, investigating the infringement, was designed to protect consumers because the jury found that Exclaim was engaged in that conduct with the But, Your Honor, I submit that the court need not even grapple with the inter-affecting commerce issue. Well, I guess any time that those unfair dissent trade practices, they have different titles and different stakes. But you look at all of that jurisprudence, it's almost completely analogous. It's for the protection of consumers and it's not for commercial versus commercial litigation. Although I would take it, in light of that though, consumers are probably somehow affected by almost any commercial versus commercial litigation to some extent. But that doesn't seem to be the type of consumer impact that these laws are aimed at. I agree, Your Honor, and I think Judge Flanagan got it right on that issue as well. But I also think that there is simply no way for Exclaim to demonstrate that the conduct of that issue is egregious or aggravating to meet the standard of unfair dissent. Speak to the calculation of damages. I don't want you to sit down and at least talk about that. I know we've got to deal with the Latin American returns fees aspect of it too, but I want to hear about this calculation of the damage of the $610,000. Sure. So, under the Act, it was DirecTV's burden to show their gross sales, their revenues. DirecTV went even further and showed their actual profits based upon calls related to satellite marketing. It then shifted to Exclaim to put in evidence that either those profits were not attributed to infringement or weren't profits at all. They did not put in any evidence of that. They did not meet their burden. The trial court looked at a specific time period. So, the specific time period. So, what the trial court did, and we believe was well within her discretion, she said, well, DirecTV, you've argued all of their profits. Exclaim, you haven't put in anything. I'm going to look at the exact, the evidence in the record regarding the number of infringing phone lines that DirecTV presented. And that was 159 different phone numbers that were tied literally to hundreds of different listings because each phone number was tied to multiple infringing listings. Did you argue to the trial court that you were entitled to the damage figure that you had presented because Exclaim defaulted or waived any defense? We argued that we were entitled to the total amount of profits and that they did not present any evidence to rebut what we put in. So, it wasn't sort of a waiver in a technical standpoint. It was simply they did not, the burden shifted to them and they didn't meet their standard. So, the trial court sort of came along and did their job for them? Essentially, yes. I mean, we believe the jury should have awarded the entire amount of profits, but what the court did is said, no, I think if you give them the full amount, that's unfair. That's going to be too much. So, she looked at the number of infringing phone lines, their admission as to how much profit they made off of each phone line per month, and multiplied it by 48 months, a four-year period. But there's some evidence that 29 of those lines have been taken down in early 2009, which is outside of the time period she considered? They actually weren't taken down, Your Honor. They admitted to owning those 29 and they admitted that they were associated with hundreds of infringing listings, but there was no evidence that those did not continue to show up. And more importantly, Your Honor, this is an issue, we could all sit here and say the court could have done a different calculation. You just made the court listen to all of it in light of the question Judge Agee asked you, and that Judge Winn asked you, that I could ask you probably some technical things. I suspect you're going to say she heard all of that and just made a rough cut on what she thought was fair and supported by the record judge. Exactly. She analyzed the synergistic factors, she explained her rationale, and it was within her sound discretion, even if we may think she could have done a different- By the way, I'm not saying necessarily that she did that, but I anticipate that's what you were going to say. Correct. You could go up one side, down one side, maybe you entitled her more, maybe she should have added another factor or emphasized something else or specifically honed in on one thing. But you think hers is a pretty fair and at least a very decent, rough approximation of the number you're entitled to. Correct, Your Honor. We believe it was conservative, but it was well-reasoned, and it was based upon all the evidence in the record. But I mean, how do you deal with it when it's a specific appellation? You can actually calculate this number when you look at the 80,000 or so in 48 hours when she did it. The question being if there's a portion of those numbers that's outside of it, it's clear they should not have been there. If the evidence is as they indicated that they were not, you say, no, they were continuing on. Your Honor, I think the question though is, again, looking at what the profits they made during that timeframe. And the cutoff, 48 months, only went through 2012. Trial took place in 2014, and there was evidence of significant infringement ongoing. So it was very difficult to try to come up with a precise number, but I don't believe that's what the Lanham Act would require, particularly when you're looking at the infringer's profits, and particularly given the discretion that the trial court has to make that determination based on the evidence. I would like to turn to what is perhaps the intellectually more interesting issue in terms of the exceptionality ruling that the court applied, because it has long been recognized by the Supreme Court, by this court in Georgia-Pacific, by legislative history, that an exceptional case is a case where the infringement is fraudulent, malicious, willful, or deliberate. We gave three specific reasons that the district court could use in making an exceptional finding in Georgia-Pacific. That there's an unusual discrepancy in the merits of the positions taken by the parties. That the non-prevailing party, which would be exclaimed, has litigated the case in an unreasonable manner. Or the last one is the need in particular circumstances to advance compensation and deterrence. So the three categories we highlighted in that case, which one does your claim fit under? Your Honor, I would submit that those factors which are non-exclusive factors under Octane were designed to allow an award of fees when the conduct didn't rise to the standard of willful, or fraudulent, or deliberate. The whole point of Octane was to loosen the standard. Prior to Octane, for a prevailing defendant, they had to show objective and subjective baselessness. What the Supreme Court was saying is we want to make it easier. So those are factors that the finding of willful infringement as there is here. I don't. Aren't you going to have a finding of willful infringement in almost all these cases, so that the exceptional case becomes just about everything? I don't believe so, Your Honor. A finding of willful infringement is not an easy one to obtain. Particularly, as Your Honor mentioned, willful isn't simply you took the act volitionally. It's that you did it with the intent to confuse or deceive. And this case, if any, presents those egregious facts with regard to the infringement. This is a case where they were listing thousands of listings using DirecTV or a misspelling of it. They were telling the company, make sure you pay close attention to the spelling. They knew they had no right to use the trademark. They were aware of the trademark. And they continued to deny it. And yet, the evidence was overwhelming that they were putting out these numbers. We had to go in and get their phone bills to show that they actually owned the phone number and were paying for it every month. This is an egregious case of willfulness. And what we're simply asking is not for this. Is it the intent that the trial court essentially abused this discretion? We're arguing that it was an abuse of discretion because she applied or misapprehended the legal standards. She essentially took maybe that second so-called exclusive fact that you talked about on whether it was unreasonable to litigate. And the judge said, well, you know, we put it to the jury. And you said you made an argument. I'm not sure you made a motion to direct the verdict. You fooled it of it. I mean, I'm not sure you formalized that. But that in and of itself, she said, shows it wasn't frivolous. The claims they were advancing were could potentially have some merit. The jury, in fact, did fine for them. So, I mean, you have that. Then it said, absent any indication of the intent, which is where you're getting on the willfulness, that if the jury finds, on one hand, willfulness to support, how can you then say that you don't have intent? That's problematic. Well, I think, though, I don't read Octane and I don't read this court's Georgia-Pacific decision to replace the standard definitions of willful infringement by these non-exclusive factors. The direction of the Supreme Court wasn't to say, instead of looking whether it's fraudulent or willful or malicious, you now look to these non-exclusive factors. That's essentially what the trial court did. And we believe that the trial court, the proper interpretation is to say, willful infringement is still an exceptional case, but even if you don't have willful infringement, the court can look at the totality of circumstances and find it even without that. Thank you very much. You have some time to come back up, I guess, on the cross-appeal, although we've already talked about this on Mr. Nanny. I'm going to please the court and I will be brief. With regard to Food Line, this court clearly said, one business is permitted to assert a UTPA claim against another business only when the businesses are competitors or potential competitors. Now, my argument to you is, I think that White makes it broader than that, but even if it's not, we clearly were competitors to the extent that we were selling services to dish dealers who were in direct competition with DirecTV. Wouldn't that be almost any commercial venture then? Almost any business suit versus business suit? Wouldn't that be? I think so. I think so, but that's what this court said. It's not aimed at consumers? You know, there's a lot of discussion in the jurisprudence about that, but it's not in the statute. There's nothing in the statute that says it has to be about consumers. Again, if you go back to the White case, they don't talk about that at all. So you say that you think that the Ag, Unfair, Deceptive Trade Practice Act is really a method for businesses to attack each other? Yes, and I understand that. Do consumers matter? Oh, certainly. Is it inferentially or primarily? I think it depends on the circumstance of the case, because if you look at White, what they say is... I'm sorry? Either primarily or simply... Yeah, depending on the circumstance of the case. Clearly, there is a cause of action for consumers when they are harmed, but there's also a cause of action for businesses. I think that's what the White case says. I think that's consistent with Food Line. With regard to the issue of willfulness of the trademark infringement, you know, the issue that the jury answered, they don't say we were willful. What they say was we use the trademark in a manner that is likely to cause confusion, mistake, or deception. Okay. Well, wouldn't that also be true almost any time you use a trademark that you don't own? I mean, they didn't say it was willful. And if you go to Georgia Pacific, and Judge Agee, I appreciate what you said about the three bases upon which a court could award attorney's fees. I don't see this case as fitting any of those three. Well, your opposing counsel says that that's just a non-exclusive list, and that's illustrative of infringement. There's no finding of willful. I mean, you can read that jury issue however you want to, but it does not use the term willful. It just doesn't. The Pacific is the only teaching from this court I'm aware of, and what it says is you've got to show one of those three. Now, arguably, it is not exclusive, but it certainly appears to me from reading the case that it is. Um, back to their damages just on the Lanham Act. Not only are exhibits 225 and 233 not tied to my client, they're not dated. I mean, you ask the question about for what period of time would they be entitled to damages. There's nothing in the record that shows if that was an infringement at all when it occurred. We think they missed their burden altogether on the damages because they said, well, here, we got your financial records here, your profits. We had 6,000 telephone numbers. By our calculation, there were 30 or 35 that had DirecTV on it, and the reason it had DirecTV on it is because we bought legacy lines from other dealers. DirecTV dealer goes out of business, exclaimed, would go to the telephone company. They'd buy those telephone lines. There was absolutely nothing improper about that. Was the evidence on the 29 that they were actually down, or were they continuing, or how was that? My client went to the telephone companies and made them change the marks to make sure that there was no listing there. When? Immediately in 2008, and then there was a second list in 2011. How many lines? I'm sorry? How many lines? 29. Now, there was evidence in there, and what does that indicate? Does it indicate they weren't operative at all during that time period, or that they still could be used? No, they were used. We made sure that the telephone companies took the term DirecTV off of the list. I mean, anytime they reached out to us, we tried. So you're saying with regard to the 29, you had them take completely the term DirecTV off of them before this time period began? Yes, sir, and the only other time they reached out. But a fact finder wouldn't have to do that. No. No, they wouldn't. Thank you, Your Honors. Thank you. Mr. Williams? Your Honors, I will be brief, and I know it's limited just to the exceptionality. Oh, you will be brief. I'll be glad to hear from you. The one point I want to make, the jury did find willfulness. In addition to the question that Mr. Nanny read, finding infringement, question number 11 says, if you responded to either question 3 or question 8 with an amount, do you find by a preponderance of the evidence that the conduct of exclaimed marketing LLC, in which you based your awards, was undertaken with the intent to confuse or deceive? Answer, yes. As this court explained in the synergistic decision, looking at the factors, whether the defendant had an intent to confuse or deceive addresses whether there has been a willful infringement on the trademark rights of the plaintiff or whether the defendant has acted in bad faith. So the jury just didn't find infringement. The jury went on to find specifically that they did it with the intent to confuse or deceive, which has always been interpreted to be intentional infringement. And that's consistent with this court's analysis in Georgia-Pacific. Unless your honors have any- There's a question. I don't remember. How much attorney fees did you ask for? I think it was in excess of a million dollars, your honor. And just to keep in mind, we're not asking this court to enter an order that we're entitled to fees. No, I understand. We're asking the court to- Send me back for her to read this. In light of the fact that willful infringement is still considered an exceptional case. If you want to say anything, and I know it's going to broaden your comments just a little bit, but I'm asking you in response to the 29 phone lines again, have you said all you want to say on that? Your honor, the issue was, and I don't recall specifically whether each of those lines continued. The problem we had was this was really like a whack-a-mole game. They continued to go on- We don't need all that. Okay. But the point is you think that the specific proof doesn't matter, that it was just a generalized rule and a rough approximation to fit it into a calculation of the wrong that the judge saw? I mean, how would you describe it? We think that the court looked at the evidence that was presented on the infringement- And that's a rough approximation? Of the infringer's profits, yes, your honor. And then it was done in her discretion. Well, I want to add one question on that. Yes, sir. On the 29th, if all of the evidence indicated they took them down before this time period, took, removed the REC TV form, and there's no evidence that there was, they were used as the REC TV, why would they not be excluded? Your honor, they continued to use the phone numbers. And what happened was these listings continued to pop up. And this gets into the infringement reports that were presented. I can't state from memory here whether there were particular phone numbers that continued after that time period. If we set it back for recalculation of damage, what a calculation of damage, why wouldn't we just ask the trial court to look at that issue? Since it seems like that focus part about it is something we're not quite clear on. I'm okay with the rough estimation in terms of it going on. But if there's specific evidence that says it went one way, and then no evidence to show that it continued, that seems problematic. Well, but your honor, this goes back to their burden. It was their burden to show that these profits were not attributed to infringement. We were at a loss with regard to their information, and they didn't provide the information. So under the statute, we have to prove their revenue. We went further and proved their sales, and they didn't put in any evidence to the contrary. All right, thank you. Thank you, your honor. Thank you very much. We'll step down to brief counsel and go to the second case.
judges: Dennis W. Shedd, G. Steven Agee, James A. Wynn Jr.